## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**UNITED STATES OF AMERICA**

**v.**                                   **Case No. 4:20cr4-MW/MAF-1**

**MOSES D. DEGRAFT-JOHNSON,**

       **Defendant.**

_____/

## STATEMENT OF FACTS

The Defendant **MOSES D. DEGRAFT-JOHNSON** admits that if this case were to proceed to trial, the government could prove the following beyond a reasonable doubt.

1.      **DEGRAFT-JOHNSON** is a physician licensed to practice medicine in the State of Florida under license number ME106359.

2.      Between on or about September 21, 2015, and on or about February 13, 2020, **DEGRAFT-JOHNSON** owned and operated Thorvasc PA, a Florida corporation doing business as the Heart and Vascular Institute of North Florida ("HVINF").   HVINF was a physician's office and outpatient catheterization laboratory located in Tallahassee, Florida.

FILED IN OPEN COURT THIS

12/18/2020

CLERK, U.S. DISTRICT
COURT, NORTH. DIST. FLA.

3.     **KIMBERLY AUSTIN** was the office manager at HVINF. **DEGRAFT-JOHNSON** paid **AUSTIN** a salary of approximately $100,000 per year.

4.     Company A, operating in the Northern District of Florida, was engaged in the business of billing health care benefit programs on behalf of medical providers including HVINF. At Defendants' direction, Company A submitted claims to health care benefit programs on behalf of HVINF. Company A received a 6% commission from collections it obtained for HVINF.

5.     The term "health care benefit program" as defined in Title 18, United States Code, Section 24, means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

6.     The Medicare program is a federal health care program providing benefits to persons who were over the age of 65 or disabled. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), which affected commerce. Medicare was administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the United States Department of Health and Human Services. Medicare was funded by federal tax dollars. Medicare Part B covered outpatient services, meaning procedures or tests that are

4:20cr4-MW/MAF-1

done in a qualified medical center without the need for an overnight stay. First Coast Service Options, Inc. ("FCSO"), located in Jacksonville, Florida, was the fiscal agent that processed the claims and maintained the records for the Medicare program in Florida. One of the critical conditions for any payment was that the service had actually been provided for a legitimate, medically necessary purpose. Medicare only reimburses services that were medically necessary and actually rendered.

7.      The TRICARE Program (TRICARE) was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), of the United States Department of Defense Military Health System, which affected commerce. TRICARE provided coverage for DOD beneficiaries worldwide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE beneficiaries. The Defense Health Agency ("DHA"), an agency of the DOD, was responsible for overseeing and administering the TRICARE program.

8.      The Florida Medicaid Program ("Florida Medicaid") was a partnership between the State of Florida and the federal government that provided medical assistance and healthcare coverage to eligible low-income Florida families and individuals ("Florida Medicaid recipients").  Florida Medicaid was authorized by

3

Title XIX of the Social Security Act, Chapter 409, Florida Statutes, and Chapter 59G, Florida Administrative Code. Florida Medicaid is financed with both federal and state funds, and was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b). The Agency for Health Care Administration ("AHCA") was a State of Florida agency responsible for Florida Medicaid. Each Florida Medicaid recipient was issued a unique ID number ("Medicaid recipient ID number") by AHCA, which was used in the submission of Florida Medicaid claims, determination of Florida Medicaid eligibility, and for processing and adjudicating Florida Medicaid claims. Under Florida Medicaid, a Florida Medicaid provider ("Provider") was a person, organization, or institution having a written agreement with the State of Florida and its Managed Care Organizations ("MCOs") to: (1) provide services to recipients, (2) submit claims for services rendered, and (3) accept as payment in full the amount paid by Florida Medicaid for submitted claims. Providers were required to possess and maintain a valid professional license pertinent to the services they were providing to Florida Medicaid recipients, and were required to comply with all applicable rules and regulations. Each provider was issued a manual or was provided with online access to regulations outlining participation requirements and guidelines. Each provider was issued a unique Florida Medicaid ID number ("Medicaid provider ID number") by AHCA which was used in the submission, processing, and payment of Florida Medicaid claims.

4

9.      Blue Cross Blue Shield ("BCBS"), Capital Health Plan (CHP), United Healthcare ("UHC"), WellCare, Humana, Florida True Health, Wisconsin Physician's Service, Aetna, Cigna, AARP, Bankers Life, Care Improvement Plus, CHA, CHAMPVA, Magellan Complete Care, and Meritain Health were private health insurers doing business in the Northern District of Florida, and each was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b), which affected commerce.

10.     The American Medical Association assigns and publishes numeric codes, known as the Current Procedural Terminology (CPT) codes.  Health care benefit programs use these codes to understand and evaluate claims submitted by providers and to decide whether to issue or deny payment. "Upcoding" is the illegal practice of billing at a higher CPT code than the service which was actually performed

11.     Together Defendants conspired to implement a scheme to submit claims for reimbursement to, and obtain money from, health care benefit programs for interventional vascular procedures which were never performed.

12.     **DEGRAFT-JOHNSON** often performed on HVINF patients a procedure known as a diagnostic angiography. It is an invasive procedure for the purpose of evaluating the inside of blood vessels and vasculature to organs of the body and the heart. For a lower extremity angiography, a needle or catheter is

5

inserted into the patient's groin and passed into an artery followed by injection of contrast material and imaging of the area in question. Among other things, this procedure is used to detect the presence of peripheral artery disease ("PAD"). But, according to applicable Medicare guidelines, "[w]ith modern noninvasive imaging techniques . . . the need for invasive diagnostic angiography has been significantly reduced. Currently, invasive angiography is mainly used to clarify contradictory findings of noninvasive studies or in conjunction with therapeutic procedures." Legitimate lower extremity angiography is properly billed under CPT Codes 75710 and 75716. Medicare reimburses providers only a few hundred dollars for such a diagnostic procedure.

13.    A diagnostic angiography is sometimes followed by an atherectomy, which is a procedure to *open* blocked coronary arteries or vein grafts by using a device on the end of a catheter to cut or shave away atherosclerotic plaque (a deposit of fat and other substances that accumulate in the lining of the artery wall). Legitimate claims for lower extremity atherectomy procedures are properly billed under CPT Codes 37225, 37227, and 37229. CPT Code 37225 relates to atherectomy of the superficial femoral artery in the thigh. CPT 37227 relates to an atherectomy on the femoral and/or popliteal arteries and includes the placement of a transluminal stent. Code 37229 relates to atherectomy of the tibial or popliteal arteries in the lower

6

leg. CPT Code 37233 is an "add on" code when an atherectomy is performed on multiple arteries in the leg.

14.     Beginning in late 2015 or early 2016 until in or around August 2019, **DEGRAFT-JOHNSON** engaged in a wide-ranging and consistent pattern of performing two diagnostic angiographies—one on each leg—and each followed by a follow-up office visit—and then billing health care benefit programs for four or more atherectomies—when such procedures had not been performed.

15.     In this pattern, with respect to a particular patient, the first fraudulent claim ("Step 1") was generally based on a diagnostic angiography which was actually performed. But **DEGRAFT-JOHNSON** wrote and electronically signed an operative report falsely stating that he performed an atherectomy on the patient's superficial femoral artery (either right or left) in the patient's upper leg. Company A would submit the claim to the applicable health care benefit program under CPT Code 37225 for $21,752.00 based upon statements in the operative report. The key phrase in the operative report supporting such a claim was this:

> We utilized the [B]oston [S]cientific rotoblade artherectomy [sic] device to perform atherectomy to the right superficial femoral artery.

16.     For the second fraudulent claim ("Step 2"), the patient would return for a follow-up visit several days later. Though he had not performed any procedure at all, **DEGRAFT-JOHNSON** wrote and electronically signed an operative report claiming that he performed an atherectomy on an artery or arteries in the patient's

7

lower leg. To generate the operative report, **DEGRAFT-JOHNSON** had to create a second appointment for the patient on the electronic calendar in HVINF's web-based electronic medical records system ("EMR"). Company A would submit the claim to the applicable health care benefit program under CPT Code 37229 for $21,478.00. If the Step 2 operative report described atherectomy of multiple arteries, the claim would also include the add-on CPT code 37233 for $2,944.

17.     The third and fourth fraudulent claims (Steps 3 and 4) are a repeat of this process on the patient's other leg. Thus, for each manifestation of this 4-Step scheme, there were two fraudulent up-coded claims (from a diagnostic angiogram to an atherectomy, Steps 1 and 3) and two phantom atherectomy claims (Steps 2 and 4) where no procedure was performed. For some patients, **DEGRAFT-JOHNSON** engaged in this 4-Step process multiple times.

18.     **DEGRAFT-JOHNSON** maintained residence in New York. **DEGRAFT-JOHNSON** customarily traveled to Tallahassee, Florida via commercial airline on Mondays. **DEGRAFT-JOHNSON** performed procedures on Monday afternoons, Tuesdays, and Wednesdays. **DEGRAFT-JOHNSON** had office visits with patients on Thursday mornings. **DEGRAFT-JOHNSON** rarely performed surgeries on Thursdays or Fridays. Because office visits were held on Thursdays, including follow-up visits, many of the Step 2 and Step 4 claims were billed for Thursday dates of service.

8

19.    It is generally considered best practice, whenever performing an atherectomy, to capture an angiographic image of the medical device *in vivo* to serve as visual documentary evidence that an atherectomy was actually performed. **DEGRAFT-JOHNSON** instructed Employee 2, a registered nurse working at HVINF, not to record images of the device in use. Not recording said images led to a lack of medical records showing atherectomies being actually performed in a small number of cases and diagnostic angiographies in the vast majority of other instances.

20.    **DEGRAFT-JOHNSON** often performed the diagnostic angiographies, whether medically necessary or not, so that he could falsely document that he had performed an atherectomy, cause the submission of an up-coded atherectomy claim, and obtain more money from health care benefit programs. To justify performing the diagnostic angiography in the first place, **DEGRAFT-JOHNSON** falsified test results in the patient's medical records, including the ankle brachial index ("ABI"). While the guidelines for management of PAD allow for the use of invasive angiography for diagnostic purposes, performing such a procedure without the proper indications represents a clear and substantial deviation from the standard of care.

21.    **DEGRAFT-JOHNSON** made false statements in his operative reports and to health care benefit programs to justify claims that he performed multiple atherectomies on a patient in successive fashion.

9

a.      Contrast induced nephropathy (CIN) is a well-recognized complication of intravascular iodinated contrast administration. The greatest risk factor for CIN is pre-existing renal dysfunction. The risk of CIN is elevated and becomes clinically important when the baseline serum creatinine level is $>=1.3$ mg/dL ($>=114.9$ micromol/L) in men and $>=1.0$ mg/dL ($<=88.4$ micromol/L) in women, equivalent to an estimated glomerular filtration rate (eGFR) <60 mL/min per 1.73 m. Elevations in creatinine or decreases in GFR could theoretically be used as a valid reason for minimizing the amount of interventional work at a given setting so as to mitigate the risk of kidney injury.  However, other modalities exist for mitigating CIN risk apart from breaking a procedure into two separate procedures. Most notably, carbon dioxide ($CO_2$), a widely available gas in medical settings, can be used as a contrast agent instead of iodinated contrast. Use of this agent, while somewhat more burdensome than use of iodinated contrast, poses absolutely no risk to the kidneys and is widely used when interventionalists have concern for CIN. Use of $CO_2$ permits longer and more extensive interventional procedures to be performed despite the presence of diminished renal function, therefore avoiding the risks associated with a second invasive procedure.

b.      **DEGRAFT-JOHNSON** was a provider for CHP. In December 2016, CHP balked at paying certain atherectomy claims. CHP obtained a peer review of patient G.H.'s case which observed that the operative notes stated there was a risk

10

of "contrast-induced nephropathy" but there was no "objective quantification of this risk."

      c.     On or about January 5, 2017, an Abbott i-STAT device was actually shipped to **DEGRAFT-JOHNSON** from an acquaintance in Jamaica at **DEGRAFT-JOHNSON**'s request, after **DEGRAFT-JOHNSON** left the device there upon completion of a surgery

      d.     On January 19, 2017, CHP sent **DEGRAFT-JOHNSON** a letter stating that an external peer review of his surgery records found that "there did not appear to be a medical reason behind performing the procedures on consecutive days."

      e.     On February 1, 2017, **DEGRAFT-JOHNSON** printed an article regarding contrast-induced nephropathy and highlighted the risk factors for it.

      f.     Beginning on February 1, 2017, and continuing thereafter, **DEGRAFT-JOHNSON** falsely stated in each operative report "The Abbott I-stat system was utilized to determine the patient's risk for contrast induce nephropathy."

      g.     **DEGRAFT-JOHNSON** did not actually use the i-STAT as stated in his operative reports. During a search of HVINF on February 13, 2020, the i-STAT device was found in a box in a closet, along with documents showing it shipped from Jamaica in January 2017. Moreover, the i-STAT device is not capable of performing GFR calculations. Instead, **DEGRAFT-JOHNSON** utilized an app on his phone to

11

perform GFR calculations. Under the guidance of Company A, **DEGRAFT-JOHNSON** falsely stated in his operative reports that he had utilized the i-STAT device to determine serum creatinine and GFR level.

h.     In a letter to CHP dated February 7, 2017, **DEGRAFT-JOHNSON** falsely stated that he followed a "protocol for prophylaxis strategies for contrast-induced nephropathy" and "[f]or every patient we encounter we utilize . . . [t]he Abbot I-Stat system to obtain objective quantification such as serum creatinine levels and GFR which is the best metric for renal function."

i.     On December 17, 2018, CHP sent another letter to **DEGRAFT-JOHNSON** stating concerns about his four-step sequence of atherectomy procedures as stated in his operative reports; that "multiple procedures were performed within a short window of time and that ultimately the procedures were not medically necessary." CHP provided **DEGRAFT-JOHNSON** peer review reports about three patients and asked **DEGRAFT-JOHNSON** to respond to each reviewer's concerns. The patient B.M.W. was included in the review. In the summer of 2016, **DEGRAFT-JOHNSON** had performed two medically unnecessary angiograms on B.M.W., billed CHP for four atherectomies, and was paid $53,365.

j.     In a letter dated February 5, 2019, **DEGRAFT-JOHNSON** falsely stated that the procedures could not have been combined because he had run a test showing the "***objective quantification for the risk of contrast-induced nephropathy***."

12

**DEGRAFT-JOHNSON** again stated, falsely, that "[f]or every patient we encounter, we utilize . . . [t]he Abbot[t] I-Stat system to obtain objective quantification such as serum creatinine levels and GFR which is the best metric."

22.     Beginning in December 2015, **DEGRAFT-JOHNSON** utilized the EMR system. The EMR includes an electronic calendar with patient appointments classified as established patient visits ("ESTPT") and surgeries ("SUR"). The appointments are color-coded on the calendar.  The color of the appointment relates to the "Visit Status." The color purple indicates that an appointment is "pending." HVINF staff would change the color code to red when the patient actually arrived for "Checked In," and then change it to green after the patient left to indicate "Checked Out." For appointments that actually took place, there is a record of HVINF staff modifying the appointment several times on the date of service to check patients in and out. To generate operative reports in the EMR for Steps 2 and 4 of the scheme, **DEGRAFT-JOHNSON** had to generate another appointment for the patient on the EMR. The following is one example, reflecting, in purple, 9 phantom surgery claims on a single day:



23.    **AUSTIN** knew that **DEGRAFT-JOHNSON** was creating phantom surgeries from the inception of the scheme. **AUSTIN** usually modified the SUR appointment after **DEGRAFT-JOHNSON** completed and signed the false operative report to indicate that the patient was "Checked Out."

24.    After **DEGRAFT-JOHNSON** wrote and electronically signed operative reports claiming he performed an atherectomy, the report went into a portion of the EMR for billing purposes. Employee 3 was an account manager at Company A. HVINF was Employee 3's main client. Employee 3 coded surgical claims for HVINF. Employee 3 coded atherectomy claims under CPT codes 37225, 327227, 37229 (and the add-on code 37233) based on **DEGRAFT-JOHNSON**'s statements in his operative reports that he performed an atherectomy and the particular artery involved. Employee 3 prepared and submitted the atherectomy claims based on HVINF's reimbursement schedule. Claims under CPT Code 37225 were billed in the amount of $21,752.00. Claims under the CPT Code 37229 were

14

billed in the amount of $21,478.00. Claims including the add-on CPT Code 37233 were billed an additional $2,944.00.

25.    Employee 4 worked as radiation technologist at HVINF from in or around September 2016 until in or around June 2017. Employee 4 assisted **DEGRAFT-JOHNSON** during procedures. Employee 4 noticed that **DEGRAFT-JOHNSON** included details in his operative reports which Employee 4 did not remember occurring. Employee 4 noticed many times that **DEGRAFT-JOHNSON** had documented an atherectomy having occurred the previous visit when Employee 4 knew that **DEGRAFT-JOHNSON** had only performed an angiogram. Employee 4 began to print these records, highlighted the incorrect information, and gave these records to **AUSTIN**. **AUSTIN** told Employee 4 that **DEGRAFT-JOHNSON** used a pre-written procedure report template in which he had to just fill in some blanks. **AUSTIN** falsely stated to Employee 4 that **DEGRAFT-JOHNSON** sometimes forgot to take out details that did not happen from the templates. **AUSTIN** sometimes said that **DEGRAFT-JOHNSON** also mixed up the patients he was documenting. Employee 4 brought this to **AUSTIN**'s attention at least three times. When Employee 4 resigned from HVINF, Employee 4 told **AUSTIN** that she was quitting because Employee 4 knew that **DEGRAFT-JOHNSON** was a "crook."

26.    Employee 2 worked as a registered nurse at HVINF from late 2015 to early 2016, and from October 2016 to May 2019. When Employee 2 returned to

4:20cr4-MW/MAF-1

HVINF, Employee 2 had access to the EMR for a period of time. Employee 2 noticed that patients had surgeries documented in the EMR which Employee 2 knew had not occurred. Employee 2 mentioned this to **AUSTIN**. **AUSTIN** falsely stated to Employee 2 that this was a mistake. After seeing more patients' surgeries documented which had not taken place, Employee 2 raised the issue with **AUSTIN** again. **AUSTIN** told Employee 2 that Employee 2 did not understand how to bill and it had to be done that way. **AUSTIN** described the practice as "bundling." Sometime after this conversation, on May 18, 2017, **AUSTIN** terminated Employee 2's access to the EMR. **AUSTIN** falsely stated that Employee 2's access to the EMR was an unnecessary expense, when in truth there was no difference in costs associated with Employee 2 having access to the EMR. Employee 2 submitted numerous anonymous complaints that HVINF was engaged in health care fraud.

27.    Employee 5 was the assistant office manager at HVINF from January 2017 until February 13, 2020. In August of 2017, Employee 5 noticed surgeries on the EMR calendar which Employee 5 knew did not take place. Employee 5 brought this to the attention of **AUSTIN** and then later to **DEGRAFT-JOHNSON**. About a month later, Employee 5 observed that the calendar had not been corrected. Employee 5 asked **AUSTIN** what was going on. **AUSTIN** told Employee 5 that Employee 5 did not understand billing or "how things worked."

4:20cr4-MW/MAF-1

28.     **AUSTIN** maintained an Excel spreadsheet titled "Angios" that tracked the dates of diagnostic angiographies which were actually performed. **AUSTIN** maintained this spreadsheet for **AUSTIN**'s own reference document for the procedures which were actually performed by **DEGRAFT-JOHNSON** in case a patient, external physician, hospital, or insurance company inquired about a particular procedure. **AUSTIN** utilized the spreadsheet to make knowingly false statements to patients and thereby conceal and further the fraudulent scheme.

29.     For procedures actually performed, there were "surgery packets" prepared in advance by HVINF employees. A surgery packet included consent forms, pre-procedural "time-out" forms, pre-operative orders, intra-procedural vital sign monitoring forms, medication administration logs, surgical logs, and post-procedural prescriptions. Employee 6, of Company A, learned that, while **DEGRAFT-JOHNSON** claimed to have performed four surgeries, there would only be two surgery packets; one surgery packet for each leg (Steps 1 and 3). Employee 6 advised **DEGRAFT-JOHNSON** that he needed a surgery packet for each procedure, with a patient signature.

30.     Beginning in approximately 2016, **DEGRAFT-JOHNSON** directed **AUSTIN** to leave the date field blank in the surgery packets for Steps 1 and 3 when patients signed the informed consent forms prior to obtaining a procedure. **AUSTIN** directed other employees to leave the date blank on the consent forms. **AUSTIN**

17

gave a false explanation for this practice to Employee 5; that patients were cancelling and rescheduling and Employee 5 was wasting paper.

31.    **AUSTIN** made copies of surgery packets with undated, but signed, consent forms for Steps 1 and 3. When patients returned to HVINF for follow up visits on Steps 2 and 4, **AUSTIN** provided the duplicate packet to **DEGRAFT-JOHNSON**. **DEGRAFT-JOHNSON** forged documents in the surgical packet to make it appear as though he had actually performed a procedure. If there were a date on the consent form (corresponding with the procedure previously performed), **DEGRAFT-JOHNSON** directed **AUSTIN** to white out the previous date, and **AUSTIN** did so. **DEGRAFT-JOHNSON** then directed that the forged surgical packets be scanned into the EMR, and some were scanned into the EMR.

32.    **DEGRAFT-JOHNSON** directed Company A and **AUSTIN** not to charge copayments on Steps 2 and 4. The purpose of not collecting copayments on Steps 2 and 4 was so that patients would not realize that **DEGRAFT-JOHNSON** had submitted fraudulent claims (for Steps 2 and 4) to health care benefit programs.

33.    **DEGRAFT-JOHNSON** kept track of the number of atherectomies billed for each patient. Employee 7 was a medical assistant working at HVINF. Employee 7 would complete intake forms when patients returned to HVINF for follow up appointments after a previous surgery. **DEGRAFT-JOHNSON** used the back side of the forms as scratch paper for handwritten checklists (with boxes and

check marks) for the 4-Step fraud on his patients. Employee 7 often saw patients returning for follow up visits (Steps 2 and 4) and checked the patient's groin area and incision site to determine if the site was healing properly. **DEGRAFT-JOHNSON** instructed **AUSTIN** when to call in patients for follow up visits so he could bill for an atherectomy which he had not performed. **AUSTIN** scheduled the patients as **DEGRAFT-JOHNSON** directed.

34.    **DEGRAFT-JOHNSON** had access to records and patient information at Hospital B in Tallahassee, Florida. **DEGRAFT-JOHNSON** provided **AUSTIN** with his log in credentials for Hospital B's computer system and instructed **AUSTIN** to print lists of Hospital B patients which were assigned to him for consulation. **AUSTIN** printed the lists. **DEGRAFT-JOHNSON** instructed **AUSTIN** to contact the patients and schedule them for appointments at HVINF. **AUSTIN** called the patients and scheduled them for appointments. **AUSTIN** scratched out the patients under 50 years of age and hospice patients.  Most of the patients were never seen or treated by **DEGRAFT-JOHNSON** prior to being called.  **AUSTIN** asked Employee 2, a registered nurse, to call Hospital B patients. But Employee 2 refused.

35.    **AUSTIN** also gave the patient lists to Employee 1, the HVINF receptionist, and instructed Employee 1 to contact Hospital B patients for appointments. **AUSTIN** instructed Employee 1 that if a patient was reluctant to make an appointment to transfer the patient to **AUSTIN** so **AUSTIN** could attempt to

19

convince the patient to schedule an appointment. Sometimes the patient Employee 1 was attempting to contact was dead. In an October 5, 2018, letter of resignation that Employee 1 left for **AUSTIN**, Employee 1 stated she "can no longer abide by putting my morals to the side for the company's benefit" and "I believe I will be better suited for a company that is more honorable in [its] day to day activities."

36.     In 2018, **DEGRAFT-JOHNSON** began calling nursing home directors and informed them that there were rumors circulating that he was falsely billing for some of the nursing homes' patients. **DEGRAFT-JOHNSON** told the nursing home directors that these rumors were false and spread by persons at Hospital B who could not stand to see him succeed.

37.     **DEGRAFT-JOHNSON** also obtained patients for HVINF through a relationship with Organization C, which provides citizens of Gadsden County, Florida, with diabetes education and care. Organization C partners with area churches to perform an outreach to those who need assistance. Organization C paid **DEGRAFT-JOHNSON** $1,600 per month. **DEGRAFT-JOHNSON** participated in the twice monthly diabetes classes held throughout Gadsden County. Organization C also had surveys printed and handed them out to attendees to complete. These surveys asked the residents about their health conditions and circulatory issues. Organization C gave these surveys to **DEGRAFT-JOHNSON**.

20

4:20cr4-MW/MAF-1

**DEGRAFT-JOHNSON** used the surveys to call patients, schedule consultations, and use such patients to engage in the Four Step Fraud.

38.    **DEGRAFT-JOHNSON** created duplicate calendar appointments and wrote operative reports falsely stating he had performed atherectomies on dates when he was not in the United States. **AUSTIN** knew that **DEGRAFT-JOHNSON** was documenting those phantom surgeries when he was in fact abroad on the date of service and routinely arranged to have **DEGRAFT-JOHNSON**'s EMR account configured for international access. A review of claims from HVINF to Medicare Part B, BCBS, Florida Medicaid FFS, CHP, Humana, Wellcare, Cigna and UHC was performed for dates of service on which **DEGRAFT-JOHNSON** was traveling out of the United States. **DEGRAFT-JOHNSON** billed a total of $6,055,291. These health care benefit programs paid $2,343,668 in reimbursements for these fraudulent claims.

39.    For example, travel records establish that **DEGRAFT-JOHNSON** was physically located in the Republic of Ghana on December 18, 19, and 20, 2018. On this occasion, Employee 3 of Company A arranged to have **DEGRAFT-JOHNSON**'s EMR account configured for international access. Subsequently **DEGRAFT-JOHNSON** added SUR appoints to the EMR calendar, and completed operative reports falsely claiming he had performed a total of 13 atherectomies on patients (A.B. (x2), D.S., P.B., M.D., T.G., H.A., L.N., M.B., J.W., H.R., A.C., and

O.L.) on December 18, 19, and 20, 2018. **AUSTIN** subsequently modified the Visit Status for each SUR appointment to green to reflect the patient was "Checked Out." This is a redacted image of the EMR calendar for December 19, 2018:



40.     Employee 5 brought these December 2018 phantom surgeries to **AUSTIN**'s attention. **AUSTIN** responded that Employee 5 did not understand how insurance worked, that this was part of the billing "bundle," that Employee 5's job was just to schedule surgeries, and Employee 5 needed to tend to that job.

41.     In or around August 2019, **DEGRAFT-JOHNSON** subsequently modified the scheme. The reason for this modification was an audit by a health care benefit program and the experience of patient F.A, who was a HVINF patient in 2019.

42.     In July 2019, F.A. complained to **DEGRAFT-JOHNSON** that her insurance company had been double billed; two procedures when the latter visit (Step 2) to HVINF was merely a follow up visit to one procedure (Step 1). **DEGRAFT-JOHNSON** relayed this complaint to **AUSTIN**. **AUSTIN** lied to F.A. with the explanation that the billing was a mistake. **AUSTIN** complied with that

22

direction, knowing that it was not a mistake even though it was not. **DEGRAFT-JOHNSON** performed a second diagnostic angiogram on F.A. in July 2019. F.A. returned for a follow up on August 1, 2019. **DEGRAFT-JOHNSON** wrote an operative report related to this date, but subsequently instructed **AUSTIN** to delete it. **AUSTIN** deleted the operative report as instructed. But when F.A. returned to HVINF in October 2019, **DEGRAFT-JOHNSON** submitted another atherectomy claim in order to avoid re-paying the health care benefit program for the fraudulent Step 2 claim. Again, **AUSTIN** lied to F.A. with the false explanation that Company A made a billing mistake.

43.     Following that audit, Employee 5's access to claim and billing information in the EMR was terminated. When Employee 5 inquired, **AUSTIN** falsely stated that Employee 5's access to the billing information was an unnecessary expense, when in truth there was no difference in costs associated with Employee 5 having access to claim and billing information in the EMR.

44.     In August 2019, **DEGRAFT-JOHNSON** directed **AUSTIN** to schedule each patient for four diagnostic angiographies. The purpose of performing four diagnostic angiographies, rather than two, was to better conceal the fraudulent scheme, as patients subjected to the scheme would remember having four procedures rather than two. **AUSTIN** relayed this instruction to HVINF staff. Patients were

23

subsequently scheduled for four diagnostic angiographies whether medically necessary or not.

45.    The patient N.S. is a 78 year old female and a WellCare beneficiary.

a.    According to the patient, N.S. went to HVINF for pain in her legs. **DEGRAFT-JOHNSON** performed four angiograms on N.S. **DEGRAFT-JOHNSON** told her she had no blockages in her arteries. The procedures performed by **DEGRAFT-JOHNSON** did not alleviate the pain in N.S.' legs. Another physician later diagnosed N.S. as suffering from arthritis.

b.    A review of EMR records for N.S. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed ten atherectomies on N.S., and caused the submission of corresponding fraudulent atherectomy claims as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 06/08/2016 | 06/09/2016 | 37229 | WellCare | $21,478.00 |
| 07/05/2016 | 07/13/2016 | 37229 | WellCare | $21,478.00 |
| 02/21/2017 | 02/22/2017 | 37225 | WellCare | $21,752.00 |
| 02/23/2017 | 02/28/2017 | 37229 | WellCare | $21,478.00 |
| 06/20/2017 | 06/26/2017 | 37225 | WellCare | $21,752.00 |
| 06/22/2017 | 06/28/2017 | 37229 37233 | WellCare | $21,478.00 $2,944.00 |
| 11/19/2018 | 11/20/2018 | 37225 | WellCare | $21,752.00 |
| 11/29/2018 | 12/06/2018 | 37229 37233 | WellCare | $21,478.00 $2,944.00 |
| 12/10/2018 | 12/21/2018 | 37225 | WellCare | $21,752.00 |
| 12/12/2018 | 12/22/2018 | 37229 37233 | WellCare | $21,478.00 $2,944.00 |

24

**AUSTIN** modified the EMR calendar on five of these claims so the calendar would show the patient had "Checked Out." Diagnostic images available for dates of service June 8 and July 5, 2016, and February 21 and June 20, 2017, show that N.S. has a disease classification of mild, with no indication an atherectomy was performed. WellCare paid **DEGRAFT-JOHNSON** $86,770.71 for these fraudulent atherectomy claims related to N.S.

46. The patient R.C. is a 70-year old female and Medicare beneficiary. She was referred to **DEGRAFT-JOHNSON** for swelling in her leg.

a. According to the patient, **DEGRAFT-JOHNSON** performed two procedures on R.C., which R.C. recalls involving a needle or catheter being inserted into her groin close to her "private parts." R.C. returned to HVINF a week after the first procedure. **DEGRAFT-JOHNSON**'s medical assistant inspected her groin area during a brief appointment. R.C. returned to HVINF for a second procedure, which took about 30 minutes to complete. A week later, R.C. returned to HVINF for another inspection of her groin by **DEGRAFT-JOHNSON**'s medical assistant. Following these procedures, her legs turned a darker color. **DEGRAFT-JOHNSON** never gave her an explanation why.

b. A review of EMR records for R.C. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating he had performed

25

eight atherectomies on R.C. Omitting the first and third claims, the remaining six fraudulent atherectomy claims are as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 11/29/2016 | 12/01/2016 | 37229 37233 | WellCare | $21,478.00 $2,944.00 |
| 12/19/2016 | 12/20/2016 | 37229 37233 | Medicare | $21,478.00 $2,944.00 |
| 10/09/2018 | 10/17/2018 | 37225 | Medicare | $21,752.00 |
| 10/16/2018 | 10/18/2018 | 37229 37233 | Medicare | $21,478.00 $2,944.00 |
| 10/17/2018 | 10/18/2018 | 37225 | Medicare | $21,752.00 |
| 11/01/2018 | 11/07/2018 | 37229 37233 | Medicare | $21,478.00 $2,944.00 |

AUSTIN modified the EMR calendar on four of these claims so the calendar would show the patient had "Checked Out." For the first of these six claims, WellCare paid DEGRAFT-JOHNSON $9,730. For the last five claims, Medicare paid DEGRAFT-JOHNSON $53,465.28.

47. The patient C.A. is a 65 year old female and Florida True Health beneficiary.

a. According to C.A., DEGRAFT-JOHNSON performed two procedures on C.A. involving stents in her right leg. A review of EMR records for C.A. shows that DEGRAFT-JOHNSON electronically signed operative reports falsely stating that he had performed six atherectomies on C.A. Conservatively omitting the three odd numbered procedures, the remaining three fraudulent atherectomy claims are as follows:

26

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 12/20/2016 | 02/16/2017 | 37229 37233 | Florida True Health | $5,000.00 $2,500.00 |
| 08/23/2018 | 08/28/2018 | 37229 | Florida True Health | $5,000.00 |
| 10/03/2018 | 10/04/2018 | 37229 37233 | Florida True Health | $5,000.00 $2,500.00 |

**DEGRAFT-JOHNSON** created after the fact SUR appointments for these dates of service. **AUSTIN** modified the appointments for dates of service August 23 and October 3, 2018, to reflect a Visit Status of "Checked Out." Florida True Health paid **DEGRAFT-JOHNSON** a total of $7,339.99 in reimbursements for these three fraudulent claims.

48.     The patient S.R. is a 59 year old female and BCBS beneficiary.

a.      According to S.R., she was referred to **DEGRAFT-JOHNSON** by her primary care physician in 2017 because of a rapid heartbeat. S.R. also suffers from autoimmune disorder, severe COPD, and incontinence. **DEGRAFT-JOHNSON** performed two angiograms on her legs in 2017. **DEGRAFT-JOHNSON** told S.R. that she had a blockage which was too small to correct and that they may be able to fix it with an ablation. When S.R. went to HVINF for the ablation the ultrasound tech told her that **DEGRAFT-JOHNSON** ordered four ablations and they were going to start on her right leg. After the ablations **DEGRAFT-JOHNSON** told S.R. that a miracle had happened and that S.R.'s body created a new vein to go around the blocked vein. Towards the end of 2019, S.R.

27

needed a refill on her heart medicine. **DEGRAFT-JOHNSON** told S.R. that he would need to do more angiograms to determine which medicine would be best for her. **DEGRAFT-JOHNSON** told S.R. that the laws had recently changed and that he could not use as much dye as he did before and that he would have to do four angiograms instead of two. During November and December of 2019, S.R. had four angiograms performed by **DEGRAFT-JOHNSON**. After those procedures, **DEGRAFT-JOHNSON** told S.R. that he did not find any blockages. During each angiogram, **DEGRAFT-JOHNSON** put a catheter in through S.R.'s groin. Subsequently, S.R. saw a new vascular doctor and cardiologist. The vascular doctor performed an ultrasound and told S.R. that she had some peripheral artery disease but that it was not severe. S.R. later saw some of her medical records from **DEGRAFT-JOHNSON** and saw that he said he had performed several atherectomies and balloon angioplasties. S.R. became upset because she knew this was not true.

b.    A review of EMR and BCBS records for S.R. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed eight atherectomies on S.R. and caused corresponding fraudulent claims to BCBS, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 11/06/2017 | 11/07/2017 | 37225 | BCBS | $21,752.00 |
| 11/13/2017 | 11/14/2017 | 37229 | BCBS | $21,478.00 |
| 11/29/2017 | 11/29/2017 | 37225 | BCBS | $21,752.00 |

28

| 12/06/2017 | 12/11/2017 | 37229 | BCBS | $21,478.00 |
| 11/20/2019 | 11/26/2019 | 37225 | BCBS | $21,752.00 |
| 12/02/2019 | 12/03/2019 | 37229 | BCBS | $21,478.00 |
|            |            | 37233 |      | $2,944.00 |
| 12/04/2019 | 12/09/2019 | 37225 | BCBS | $21,752.00 |
| 12/09/2019 | 12/10/2019 | 37229 | BCBS | $21,478.00 |
|            |            | 37233 |      | $2,944.00 |

BCBS paid **DEGRAFT-JOHNSON** $107,808 in reimbursements for these fraudulent claims. Diagnostic images available for the November 6 and November 29, 2017, dates of service show S.R.'s condition as normal.

49.    The patients T.M.L and D.F.L. are married. T.F.L. is a 58 year old female. D.F.L. is a 60 year old male. They are BCBS beneficiaries.

a.    According to T.M.L and D.F.L., they were both referred to **DEGRAFT-JOHNSON** by their primary care physician. They both had painful varicose veins in their legs. They had consultations with **DEGRAFT-JOHNSON** on the same day. **DEGRAFT-JOHNSON** told them that there were five steps for a good cardiac health workup. Those include ultrasounds, echocardiograms, a stress test, ultrasound of the carotids and checking blood flow in the legs. After checking the blood flow in their legs **DEGRAFT-JOHNSON** told T.M.L. and D.F.L. that they eachneeded an angiogram to check for blockages. The first time they each went in for an angiogram on one leg. **DEGRAFT-JOHNSON** performed the procedures. They were given some pain medications and the procedure took about 20-30 minutes. They returned soon for a follow-up visit. **DEGRAFT-JOHNSON** told D.F.L. that he had bad blood flow but no blockages. **DEGRAFT-JOHNSON** told

29

T.F.L. that she was fine. About one month later they returned for a second angiogram. Again, it took about 20-30 minutes and was performed by **DEGRAFT-JOHNSON**. When they returned for the follow-up **DEGRAFT-JOHNSON** told them both they did not have any blockages but that they should wear compression hose.

      b.   A review of EMR and BCBS records for T.M.L and D.F.L. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on T.F.L. and four atherectomies on D.F.L., and caused corresponding fraudulent claims to BCBS, as follows:

| DATE OF SERVICE | CLAIM DATE | PATIENT INITIALS | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|---|
| 11/21/2017 | 11/22/2017 | T.M.L. | 37225 | BCBS | $21,752.00 |
| 11/21/2017 | 11/22/2017 | D.F.L. | 37225 | BCBS | $21,752.00 |
| 11/27/2017 | 11/28/2017 | T.M.L. | 37229 | BCBS | $21,478.00 |
| 11/27/2017 | 11/28/2017 | D.F.L | 37229 | BCBS | $21,478.00 |
| 12/12/2017 | 12/13/2017 | T.M.L. | 37225 | BCBS | $21,752.00 |
| 12/12/2017 | 12/13/2017 | D.F.L | 37225 | BCBS | $21,752.00 |
| 12/21/2017 | 12/23/2017 | T.M.L. | 37229 | BCBS | $21,478.00 |
| 12/21/2017 | 12/23/2017 | D.F.L. | 37229 | BCBS | $21,478.00 |

BCBS paid **DEGRAFT-JOHNSON** $106,386.32 in reimbursements for these fraudulent claims. For each claim coded 37229, **DEGRAFT-JOHNSON** added a SUR appointment to the EMR calendar after the fact. For the November 27, 2017, date of service, **AUSTIN** then modified the appointments to reflect a Visit Status of "Checked Out." For the December 21, 2017, date of service, **DEGRAFT-JOHNSON** added a total of fourteen SUR appointments to the EMR with corresponding operative reports and fraudulent claims to health care benefit programs.

4:20cr4-MW/MAF-1

50.    In March 2018, **DEGRAFT-JOHNSON** and his spouse were participating in an executive MBA program offered by Brown University. In his application **DEGRAFT-JOHNSON** stated "[a]fter 17 years of practicing medicine, I'm ready to return back home to Ghana." **DEGRAFT-JOHNSON** paid the tuition and associated expenses from funds in the HVINF bank accounts. Part of the program involved two weeks of coursework in Madrid, Spain, in March of 2018. Travel records establish that **DEGRAFT-JOHNSON** was on a flight to Spain on March 2, 2018, and returned to the United States on March 17, 2018.

51.    The patient L.D. is an 88 year old female and WellCare beneficiary. L.D. had an established patient visit with a medical assistant at HVINF on March 12, 2018, while **DEGRAFT-JOHNSON** was abroad. On March 21, 2018, **DEGRAFT-JOHNSON** added a SUR appointment to the March 12 EMR calendar for L.D. and electronically signed an operative report falsely stating that he had performed an atherectomy on L.D. on March 12, 2018. **DEGRAFT-JOHNSON** caused Company A to bill WellCare $21,478.00 for this procedure under CPT Code 37229. WellCare paid HVINF $8,402.07 for that claim.

52.    The patient J.F.D.P. is a 75 year old female and Medicare beneficiary.

a.    According to J.F.D.P., she was referred to HVINF by her primary care doctor for severe pain in her legs. During an initial visit, **DEGRAFT-JOHNSON** told J.F.D.P. that her veins were like Capital Circle in Tallahassee and

31

that hers had a road block and needed a detour. J.F.D.P returned for two procedures which **DEGRAFT-JOHNSON** described as a "roto-rooter." **DEGRAFT-JOHNSON** performed one procedure on each leg. Each procedure lasted about 15 minutes. A review of the available images for these two procedures revealed no vascular disease in one leg, a mild condition in the other, and no evidence of an atherectomy being performed. Following these procedures, **DEGRAFT-JOHNSON** told J.F.D.P. he had done all he could for her and that he could not do anything more to help her. Her legs continued to hurt. Another physician subsequently performed ablations on J.F.D.P.'s legs. Those ablation procedures alleviated J.F.D.P.'s pain.

b.     A review of EMR and Medicare records for J.F.D.P. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on J.F.D.P and caused corresponding fraudulent claims to Medicare, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 04/10/2018 | 04/10/2018 | 37225 | Medicare | $21,752.00 |
| 04/19/2018 | 04/23/2018 | 37229 | Medicare | $21,478.00 |
| 03/05/2019 | 03/06/2019 | 37225 | Medicare | $21,752.00 |
| 05/08/2018 | 05/10/2018 | 37229 | Medicare | $21,478.00 |

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the April 19 and May 8 claims after the fact. **AUSTIN** then modified the appointments

32

to reflect a Visit Status of "Checked Out." Medicare paid **DEGRAFT-JOHNSON**

approximately $33,191.54 for these fraudulent claims.

53.    The patient R.J.L. is a 71 year old male and Medicare beneficiary.

a.    According to R.J.L., around the end of 2017 and the beginning

of 2018, his ankle started hurting when he played pickle ball. R.J.L went to a couple

of ankle doctors and was diagnosed with a vascular problem. R.J.L. was referred to

**DEGRAFT-JOHNSON** by another physician. R.J.L first saw **DEGRAFT-**

**JOHNSON** on February 2, 2018, for a new patient visit. A technician performed an

ablation which alleviated the pain. Sometime later, R.J.L bruised his inner thigh

bumping into a table. R.J.L. had an MRI which determined he only had a contusion,

but detected plaque in his iliac artery. **DEGRAFT-JOHNSON** subsequently

performed two procedures, one on each leg, and then follow up visits for each

procedure. After the first procedure, he was told that nothing had been found. R.J.L.

had follow up office visits after each diagnostic procedure, where no procedure was

performed. A review of the available images for a May 30, 2018, date of service

shows that R.J.L.'s condition was normal.

b.    A review of EMR and Medicare records for R.J.L shows that

**DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that

he had performed four atherectomies on R.J.L. and caused corresponding fraudulent

claims to Medicare, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 05/30/2018 | 05/31/2018 | 37225 | Medicare | $21,752.00 |
| 06/15/2018 | 06/25/2018 | 37229 | Medicare | $21,478.00 |
| 07/09/2018 | 07/10/2018 | 37225 | Medicare | $21,752.00 |
| 07/12/2018 | 07/17/2018 | 37229 | Medicare | $21,478.00 |

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the June 15 and July 12 claims after the fact. Each of these four claims included R.J.L.'s name, date of birth, and Medicare beneficiary number, which is based on beneficiary's Social Security number. Medicare would not have paid the claims without inclusion of those means of identification in support of the claims. Medicare paid **DEGRAFT-JOHNSON** approximately $33,191.54 for these fraudulent claims. For the July 12, 2018, date of service, **DEGRAFT-JOHNSON**, caused claims for a total of 10 phantom atherectomy procedures, including R.J.L. and 9 other patients.

54.     The patient B.M.W. is a 61 year old female and CHP beneficiary.

a.      According to B.M.W., she went to HVINF five times. She had procedures twice. After these procedures, **DEGRAFT-JOHNSON** told her that she did not have any blockages in her legs.

b.      A review of EMR and CHP records for B.M.W. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on B.M.W. and caused corresponding fraudulent claims to CHP, as follows:

34

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 06/06//2018 | 06/08/2018 | 37225 | CHP | $21,752.00 |
| 06/14/2018 | 06/15/2018 | 37229 | CHP | $21,478.00 |
| 07/11/2018 | 07/19/2018 | 37225 | CHP | $21,752.00 |
| 07/19/2018 | 07/24/2018 | 37229 | CHP | $21,478.00 |

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the June 14 and July 19 claims after the fact. **AUSTIN** then modified those appointments to reflect a Visit Status of "Checked Out." CHP paid **DEGRAFT-JOHNSON** approximately $52,415.04 for these fraudulent claims.

55.    The patient S.W. is a 61 year old female and UHC beneficiary.

a.    According to S.W., she visited **DEGRAFT-JOHNSON**'s office six times. She had one invasive procedure. Afterwards **DEGRAFT-JOHNSON** told her that he had put a stent in her leg.

b.    A review of EMR and UHC records for S.W. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on S.W. and caused corresponding fraudulent claims to UHC, for at least the second, third, and fourth atherectomy claims, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 07/03/2018 | 07/03/2018 | 37229 | UHC | $21,478.00 |
| 07/12/2018 | 07/17/2018 | 37225 | UHC | $21,752.00 |
| 09/27/2018 | 10/04/2018 | 37229 | UHC | $21,478.00 |

35

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the July 12 and September 27 claims after the fact. **AUSTIN** then modified the September 27 SUR appointment to reflect a Visit Status of "Checked Out." UHC paid **DEGRAFT-JOHNSON** approximately $28,505.16 for these three fraudulent claims.

56.    On October 19, 2018, **DEGRAFT-JOHNSON** traveled from New York to Madrid, Spain. He returned to the United States, on October 31, 2018. **DEGRAFT-JOHNSON**'s credit card records shows a $21,139.62 hotel charge and a $61,473.81 charge at a department store, both located in Madrid, Spain. The EMR calendar reflects **DEGRAFT-JOHNSON**'s absence from the HVINF office during that period.

a.    The patient L.S.W. is a 75 year old female and Medicare patient. L.S.W. was scheduled for an established patient visit on October 23, 2018. On November 7, 2018, **DEGRAFT-JOHNSON** added a SUR appointment to the October 23, 2018, EMR calendar for L.S.W. **DEGRAFT-JOHNSON** also created and electronically signed an operative report falsely stating that he performed an atherectomy on L.S.W. on October 23, 2018. That same day, Company A billed Medicare $21,478.00 under CPT code 37229, and $2,944.00 under CPT code 37233, for this claim. On November 12, 2018, **AUSTIN** modified the SUR appointment to show a "Visit Status" of "Checked Out." Medicare paid **DEGRAFT-JOHNSON**

$9,361.07 for this fraudulent claim. Medicare paid **DEGRAFT-JOHNSON** a total of $52,022.06 in reimbursement for a total of six atherectomies which **DEGRAFT-JOHNSON** claimed he performed on L.S.W.

      b.    The patient E.H. is a 65 year old male and BCBS beneficiary. E.H. was scheduled for an established patient visit on October 26, 2018. On November 7, 2018, **DEGRAFT-JOHNSON** added a SUR appointment to the October 26 EMR calendar for E.H. **DEGRAFT-JOHNSON** also created and electronically signed an operative report falsely stating that he performed an atherectomy on E.H. on October 26, 2018. That same day, Company A billed Medicare $21,478.00 under CPT code 37229, and $2,944.00 under CPT code 37233, for this claim. On November 12, 2018, **AUSTIN** modified the SUR appointment to show a "Visit Status" of "Checked Out." BCBS paid **DEGRAFT-JOHNSON** $14,827.96 for this fraudulent claim. BCBS paid **DEGRAFT-JOHNSON** a total of $55,779.98 for the six atherectomies which **DEGRAFT-JOHNSON** claimed to have performed on E.H.

      c.    The patient F.S. is a 75 year old male and Medicare beneficiary. F.S. was scheduled for an established patient visit on October 30, 2018. On November 1, 2018, **DEGRAFT-JOHNSON** added a SUR appointment to the EMR calendar for F.S. **DEGRAFT-JOHNSON** also created and electronically signed an operative report falsely stating that he performed an atherectomy on F.S. on October

30, 2018. **AUSTIN** modified the SUR appointment to show a "Visit Status" of "Checked Out." On November 2, 2018, Company A billed Medicare $21,752.00 under CPT code 37225, for this claim. Medicare paid **DEGRAFT-JOHNSON** $8,352.25 for this fraudulent claim.

d.      The patient N.M. is a 63 year old female and a WellCare beneficiary. N.M was scheduled for an established patient visit on October 30, 2018. On November 7, 2018, **DEGRAFT-JOHNSON** added a SUR appointment to the EMR calendar for N.M. **DEGRAFT-JOHNSON** also created and electronically signed an operative report falsely stating that he performed an atherectomy on N.M. on October 26, 2018. That same day, Company A billed Medicare $21,478.00 under CPT code 37229, and $2,944.00 under CPT code 37233, for this claim. On November 12, 2018, **AUSTIN** modified the SUR appointment to show a "Visit Status" of "Checked Out." WellCare paid **DEGRAFT-JOHNSON** $2,250.19 for this fraudulent claim. WellCare paid **DEGRAFT-JOHNSON** a total of $15,975.74 for the eight atherectomies which **DEGRAFT-JOHNSON** claimed to have performed on N.M. Images available for diagnostic angiographies performed on August 8, 2017, and September 20, 2017, shows N.M.'s condition as normal. It would have been impossible for significant atherosclerotic occlusive disease to have developed between September 2017 and October 2018, as development of atherosclerosis is an indolent, slow-moving process.

38

4:20cr4-MW/MAF-1

57.   The patient M.K.W. is a 65 year old female and WellCare beneficiary.

a.   According to M.K.W., she was referred to **DEGRAFT-JOHNSON** for "hurting in her chest." **DEGRAFT-JOHNSON** saw M.K.W. in his office between 15 and 20 times. **DEGRAFT-JOHNSON** performed a total of four angiograms on four separate days. There were follow up examinations conducted by a nurse. **DEGRAFT-JOHNSON** told M.K.W. that she had no blockages in her arteries. The procedures did not alleviate M.K.W.'s pain.

b.   A review of EMR and WellCare records for M.W.K. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed eight atherectomies on M.K.W. and caused corresponding fraudulent claims to WellCare, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 09/25/2018 | 09/27/2018 | 37225 | WellCare | $21,752.00 |
| 10/17/2018 | 10/18/2018 | 37229 | WellCare | $21,478.00 |
|  |  | 37233 |  | $2,944.00 |
| 11/02/2018 | 11/6/2018 | 37225 | WellCare | $21,752.00 |
| 11/13/2018 | 11/20/2018 | 37229 | WellCare | $21,478.00 |
|  |  | 37233 |  | $2,944.00 |
| 07/23/2019 | 07/25/2019 | 37225 | WellCare | $21,752.00 |
| 08/01/2019 | 08/06/2019 | 37229 | WellCare | $21,478.00 |
| 08/06/2019 | 08/08/2019 | 37225 | WellCare | $21,752.00 |
| 08/15/2019 | 08/21/2019 | 37229 | WellCare | $21,478.00 |

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the October 17 and November 13, 2018, claims, and the August 1 and August 15, 2019, claims after the fact. **AUSTIN** then modified those appointments to reflect a Visit Status of "Checked Out." Additionally, **DEGRAFT-JOHNSON** was in the

39

Republic of Ghana on November 13, 2018. WellCare paid **DEGRAFT-JOHNSON** approximately $80,910.48 for these fraudulent claims.

58.    The patient C.S. is a 67 year old male and Medicare beneficiary.

a.    C.S. suffers from severe mental illness, including schizophrenia (manic depressive) and bipolar disorder. C.S. lacks the capacity to understand or recall events. The sister of C.S. serves as his Medicaid Certified Caretaker ("MCC"). According to the MCC, **DEGRAFT-JOHNSON** treated C.S. for circulatory problems. MCC accompanied C.S. to appointments. **DEGRAFT-JOHNSON** performed a procedure on C.S. involving a stent at a local hospital.

b.    A review of EMR and Medicare records for C.S. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on C.S. at HVINF and caused corresponding fraudulent claims to Medicare, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 10/03/2018 | 10/15/2018 | 37225 | Medicare | $21,752.00 |
| 11/01/2018 | 11/07/2018 | 37229 | Medicare | $21,478.00 |
|  |  | 37233 |  | $2,944.00 |
| 11/06/2018 | 11/07/2018 | 37225 | Medicare | $21,752.00 |
| 11/13/2018 | 11/13/2018 | 37229 | Medicare | $21,478.00 |
|  |  | 37233 |  | $2,944.00 |

On November 9, 2018, **DEGRAFT-JOHNSON** traveled to the Republic of Ghana. He returned to the United States on November 17, 2018. **DEGRAFT-JOHNSON** was not physically present in the United States on the November 13, 2018, date of

40

service. **DEGRAFT-JOHNSON** added SUR appointments for the November 1 and November 13 dates of service. **AUSTIN** modified the SUR appointments to show a Visit Status of "Checked Out." Medicare paid **DEGRAFT-JOHNSON** $35,426.64 in reimbursements for these claims.

59.     On January 9, 2019, **DEGRAFT-JOHNSON** traveled to London, United Kingdom. He returned to the United States on January 21, 2019.

a.     The patient M.B. is a 63 year old female and CHP beneficiary. M.B. had an established patient visit with a medical assistant at HVINF on January 14, 2019, while **DEGRAFT-JOHNSON** was abroad. On January 24, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the January 14, 2019, EMR calendar for M.B. and electronically signed an operative report falsely stating that he had performed an atherectomy on M.B. on January 14, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. CHP paid HVINF $16,524.39 for that claim. CHP paid **DEGRAFT-JOHNSON** $29,679.96 for two other atherectomy claims on dates of service January 7 and February 6, 2019. Images available for the January 7 date of service show M.B.'s condition as normal.

b.     The patient C.B. is a 53 year old male and BCBS beneficiary. C.B. also had an established patient visit with a medical assistant at HVINF on

41

January 14, 2019, while **DEGRAFT-JOHNSON** was abroad. On January 24, 2019,

**DEGRAFT-JOHNSON** added a SUR appointment to the January 14, 2019, EMR

calendar for C.B. and electronically signed an operative report falsely stating that he

had performed an atherectomy on C.B. on January 14, 2019. **AUSTIN** then modified

the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-**

**JOHNSON** caused Company A to bill BCBS $21,478.00 for this procedure under

CPT Code 37229 and $2,944 for CPT code 37233. BCBS paid HVINF $14,822.96

for that claim. BCBS paid **DEGRAFT-JOHNSON** a total of $55,789.98 for four

atherectomy claims related to C.B. Images available for three other dates of service

show C.B.'s condition as normal.

        c.     The patient H.R. is an 89 year old male and CHP beneficiary.

H.R. had an established patient visit with a medical assistant at HVINF on January

15, 2019, while **DEGRAFT-JOHNSON** was abroad. On January 24, 2019,

**DEGRAFT-JOHNSON** added a SUR appointment to the January 15, 2019, EMR

calendar for H.R. and electronically signed an operative report falsely stating that he

had performed an atherectomy on H.R. on January 15, 2019. **AUSTIN** then modified

the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-**

**JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under

CPT Code 37229 and $2,944 for CPT code 37233. CHP paid HVINF $14,252.69 for

that claim. CHP paid **DEGRAFT-JOHNSON** a total of $74,232.22 for a total of eight atherectomy claims related to H.R.

      d.    The patient P.M.R. is a 74 year old female and CHP beneficiary. P.M.R. had an established patient visit with a medical assistant at HVINF on January 15, 2019, while **DEGRAFT-JOHNSON** was abroad. On January 24, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the January 15, 2019, EMR calendar for P.M.R. and electronically signed an operative report falsely stating that he had performed an atherectomy on P.M.R. on January 15, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. CHP paid HVINF $14,252.69 for that claim. CHP paid **DEGRAFT-JOHNSON** a total of $46,537.14 for a total of four atherectomy claims related to P.M.R. Images available for dates of service January 8 and January 28, 2019, show P.M.R.'s condition as normal.

      e.    The patient D.H. is a 71 year old female and Medicare beneficiary. D.H. had an established patient visit with a medical assistant at HVINF on January 15, 2019, while **DEGRAFT-JOHNSON** was abroad. On January 24, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the January 15 EMR calendar for D.H. and electronically signed an operative report falsely stating that

that he had performed an atherectomy on D.H. on January 15, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. Medicare paid HVINF $10,404.77 for that claim.

60.     **DEGRAFT-JOHNSON** traveled to the Republic of Ghana on February 8, 2019. He returned to the United States on February 17, 2019.

a.     D.H. had an established patient visit with a medical assistant at HVINF on February 12, 2019, while **DEGRAFT-JOHNSON** was abroad. On March 12, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the February 12 EMR calendar for D.H. and electronically signed an operative report falsely stating that he had performed an atherectomy on D.H. on February 12, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. Medicare paid HVINF $10,404.77 for that claim. Medicare paid **DEGRAFT-JOHNSON** a total of $39,390.37 for a total of four atherectomy claims related to D.H.

b.     The patient E.W. is a 58 year old female and BCBS beneficiary. According to E.W., she was referred to **DEGRAFT-JOHNSON** for numbness on the bottom of her foot. **DEGRAFT-JOHNSON** performed two procedures

44

involving the insertion of a catheter or needle into her groin which took less than fifteen minutes. After the procedures, **DEGRAFT-JOHNSON** told her she had no blockages. After each procedure, and saw the medical assistant to make sure the incision site was healing. **DEGRAFT-JOHNSON** ordered an MRI for E.W. but she could not afford the co-pay and did not have it done. E.W. never heard from **DEGRAFT-JOHNSON**'s office again. E.W. still has numbness in her foot. E.W. had an established patient visit with a medical assistant at HVINF on February 15, 2019, while **DEGRAFT-JOHNSON** was abroad. On February 18, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the February 12, 2019, EMR calendar for E.W. and electronically signed an operative report falsely stating that he had performed an atherectomy on E.W. on February 15, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. BCBS paid HVINF $14,822.96 for that claim. **DEGRAFT-JOHNSON** caused the submission of three other fraudulent atherectomy claims related to E.W. on dates of service February 5, February 18, and February 20, 2020. Images available for the February 5 and February 18 dates of service show that E.W.'s condition was normal. BCBS paid **DEGRAFT-JOHNSON** a total of $55,789.98 for these four fraudulent atherectomy claims related to E.W.

45

61.     The patient J.G. is a 51 year old female and BCBS beneficiary.

a.      According to J.G., she has a genetic blood disorder which affects her organs. Because of this, in 2018, J.G. sought to establish a relationship with a cardiologist. Her friend, S.R., was a patient of **DEGRAFT-JOHNSON** and suggested that J.G. see him. J.G. discussed it with her primary care physician and decided to establish with **DEGRAFT-JOHNSON** in December 2018. J.G. told **DEGRAFT-JOHNSON** that she had some swelling in her ankles and he had an ultrasound performed on her legs. **DEGRAFT-JOHNSON** told her that she may have some blockages in the arteries of her legs and that she needed an angiogram. **DEGRAFT-JOHNSON** performed two angiograms on J.G. about two weeks apart in February and March 2019. **DEGRAFT-JOHNSON** told J.G. that he did not find any blockages and that she needed to have a venous ablation performed. **DEGRAFT-JOHNSON**'s ultrasound tech performed the ablation during a different office visit. The procedure was very painful and J.G. decided not to return to **DEGRAFT-JOHNSON** for any more procedures.

b.      A review of EMR and BCBS records for J.G. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on J.G. and caused corresponding fraudulent claims to BCBS, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
| --- | --- | --- | --- | --- |

| 02/26/2019 | 02/27/2019 | 37225 | BCBS | $21,752.00 |
| 02/28/2019 | 03/03/2017 | 37229 | BCBS | $21,478.00 |
|  |  | 37233 |  | $2,942.00 |
| 03/05/2019 | 03/06/2019 | 37225 | BCBS | $21,752.00 |
| 03/12/2019 | 03/21/2019 | 37229 | BCBS | $21,478.00 |
|  |  | 37233 |  | $2,942.00 |

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the February 28 and March 12 claims after the fact. **AUSTIN** then modified the appointments to reflect a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** was physical located in the Republic of Ghana on March 12, 2019. BCBS paid **DEGRAFT-JOHNSON** approximately $55,569.98 in reimbursements for these fraudulent claims.

62.     On March 8, 2019, **DEGRAFT-JOHNSON** traveled to the Republic of Ghana. He returned to the United States on March 19, 2019.

a.      The patient G.S. is a 68 year old female and Medicare beneficiary. G.S. had an established patient visit with a medical assistant at HVINF on March 11, 2019, while **DEGRAFT-JOHNSON** was abroad. On March 20, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the March 11 EMR calendar for G.S. and electronically signed an operative report falsely stating that he had performed an atherectomy on G.S. on March 11, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill Medicare $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. Medicare paid HVINF

47

$10,404.77 for that claim. Medicare paid **DEGRAFT-JOHNSON** $29,098.19 for three other atherectomy claims related to G.S.

      b.     The patient C.S.T. is a 70 year old female and CHP beneficiary. C.S.T. had an established patient visit with a medical assistant at HVINF on March 12, 2019, while **DEGRAFT-JOHNSON** was abroad. On March 20, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the March 12, 2019, EMR calendar for C.S.T. and electronically signed an operative report falsely stating that he had performed an atherectomy on C.S.T. on March 12, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229 and $2,944 for CPT code 37233. CHP paid HVINF $12,947.28 for that claim. CHP paid **DEGRAFT-JOHNSON** a total $46,713.27 for three other atherectomy claims related to C.S.T.

      c.     The patient I.S. is a 66 year old male and CHP beneficiary. I.S. had an established patient visit with a medical assistant at HVINF on March 12, 2019, while **DEGRAFT-JOHNSON** was abroad. On March 20, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the March 12, 2019, EMR calendar for I.S. and electronically signed an operative report falsely stating that he had performed an atherectomy on I.S. on March 12, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-**

48

**JOHNSON** caused Company A to bill CHP $21,752.00 for this procedure under CPT Code 37225. CHP paid HVINF $11,626.70 for that claim. CHP paid **DEGRAFT-JOHNSON** a total of $37,521.26 for three other atherectomy claims related to I.S.

        d.     The patient R.S. is a 76 year old male and BCBS beneficiary. R.S. had an established patient visit with a medical assistant at HVINF on March 13, 2019, while **DEGRAFT-JOHNSON** was abroad. On March 20, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the March 13, 2019, EMR calendar for R.S. and electronically signed an operative report falsely stating that he had performed an atherectomy on R.S. on March 13, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill BCBS $21,478.00 for this procedure under CPT Code 37229 and $5,888.00 for CPT code 37233. BCBS paid HVINF $16,638.57 for that claim. BCBS paid **DEGRAFT-JOHNSON** a total of $13,042.03 for one other atherectomy claim related to R.S.

      63.     The patient T.D. is a 57 year old female and Medicare beneficiary.

        a.     T.D. was referred by her primary care practitioner to **DEGRAFT-JOHNSON** regarding a bulge in T.D.'s aorta. **DEGRAFT-JOHNSON** told T.D. that he wanted to conduct procedures in her legs to determine if she had any blockages. **DEGRAFT-JOHNSON** performed two diagnostic

angiographies on T.D.; one on each leg. According to T.D., the procedures consisted of staff shaving the area of her groin and **DEGRAFT-JOHNSON** inserting a needle with a camera to look for blockages in her lower extremities. T.D. did not have any blockages. T.D. had three follow up visits where no procedure was performed. For several of these visits, **DEGRAFT-JOHNSON** was not present in the HVINF office.

b.    A review of EMR and Medicare records for T.D. shows that **DEGRAFT-JOHNSON** electronically signed operative reports falsely stating that he had performed four atherectomies on T.D. and caused corresponding fraudulent claims to Medicare, as follows:

| DATE OF SERVICE | CLAIM DATE | CPT CODE(S) | HCBP PROGRAM | AMOUNT CLAIMED |
|---|---|---|---|---|
| 04/17/2019 | 04/24/2019 | 37225 | Medicare | $21,752.00 |
| 04/25/2019 | 05/02/2019 | 37229 37233 | Medicare | $21,478.00 $2,944.00 |
| 05/30/2019 | 06/03/2019 | 37225 | Medicare | $21,752.00 |
| 06/13/2019 | 06/14/2019 | 37229 37233 | Medicare | $21,478.00 $2,944.00 |

**DEGRAFT-JOHNSON** added SUR appointments to the EMR calendar for the April 25 and June 13 claims after the fact. **AUSTIN** then modified those appointments to reflect a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** was physically located in the Republic of Ghana on April 25, 2019. Medicare paid **DEGRAFT-JOHNSON** approximately $39,502.96 for these four fraudulent claims

4:20cr4-MW/MAF-1

related to T.D. Images available from the April 17 and May 30, 2019, dates of service show T.D.'s condition as normal.

64.    **DEGRAFT-JOHNSON** traveled to the Republic of Ghana on April 19, 2019. He returned to the United States on April 27, 2019.

a.    The patient C.G. is a 65 year old male and BCBS beneficiary. C.G. had an established patient visit with a medical assistant at HVINF on April 25, 2019, while **DEGRAFT-JOHNSON** was abroad. On May 1, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the April 25 EMR calendar for C.G. and electronically signed an operative report falsely stating that he had performed an atherectomy on C.G. on April 25, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill Medicare $21,478.00 for this procedure under CPT Code 37229 and $5,888.00 for CPT code 37233. Medicare paid HVINF $10,404.77 for that claim. Medicare paid **DEGRAFT-JOHNSON** a total of $39,502.96 for a total of four atherectomy claims related to C.G. Images available from the April 3 and April 17, 2019, dates of service show C.G.'s condition as normal.

b.    The patient A.H. is a 38 year old female and Medicare beneficiary. A.H. had an established patient visit with a medical assistant at HVINF on April 25, 2019, while **DEGRAFT-JOHNSON** was abroad. On May 1, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the April 25 EMR calendar

51

for A.H. and electronically signed an operative report falsely stating that he had performed an atherectomy on A.H. on April 25, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill Medicare $21,478.00 for this procedure under CPT Code 37229 and $2,944.00 for CPT code 37233. Medicare paid HVINF $10,404.77 for that claim. Medicare paid **DEGRAFT-JOHNSON** a total of $39,502.96 for three other atherectomy claims related to A.H. Images available from the April 2 and April 16, 2019, dates of service show A.H.'s condition as normal.

65.    **DEGRAFT-JOHNSON** traveled to Shanghai, China, on May 8, 2019. He returned to the United States on May 13, 2019. The patient R.L. is a 83 year old female and CHP beneficiary. R.L. had an established patient visit with a medical assistant at HVINF on May 9, 2019, while **DEGRAFT-JOHNSON** was abroad. On May 15, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the May 9, 2019, EMR calendar for R.L. and electronically signed an operative report falsely stating that he had performed an atherectomy on R.L. on May 9, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill CHP $21,478.00 for this procedure under CPT Code 37229. CHP paid HVINF $11,679.11 for that claim. CHP paid **DEGRAFT-JOHNSON** a total of $39,502.96 for three other atherectomy claims related to R.L.

52

66.     **DEGRAFT-JOHNSON** traveled to the Republic of Ghana on June 7, 2019. He returned to the United States (New York, New York) on June 10, 2019. On June 12, 2019, **DEGRAFT-JOHNSON** traveled from New York to Tallahassee, Florida. The patient S.G. is a 42 year old female and BCBS beneficiary. S.G. had an established patient visit with a medical assistant at HVINF on June 10, 2019, while **DEGRAFT-JOHNSON** was abroad. On June 12, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the June 10, 2019, EMR calendar for S.G. and electronically signed an operative report falsely stating that he had performed an atherectomy on S.G. on June 10, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill BCBS $21,478.00 for this procedure under CPT Code 37229 and $2,944.00 under CPT Code 37233. BCBS paid HVINF $14,822.96 for that claim. BCBS paid **DEGRAFT-JOHNSON** a total of $80,103.43 for six other atherectomy claims related to S.G.

67.     **DEGRAFT-JOHNSON** traveled to the United Kingdom on June 20, 2019. He returned to the United States on June 23, 2019. The patient J.M. is a 56 year old male and BCBS beneficiary. On June 21, 2019, J.M. had an established patient visit with a medical assistant at HVINF while **DEGRAFT-JOHNSON** was abroad. On June 24, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the June 21 EMR calendar for J.M. and electronically signed an operative report

53

falsely stating that he had performed an atherectomy on J.M. on June 21, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill BCBS $21,478.00 for this procedure under CPT Code 37229 and $2,944.00 under CPT Code 37233. BCBS paid HVINF $15,339.27 for that claim. BCBS paid **DEGRAFT-JOHNSON** a total of $40,446.89 for three other atherectomy claims related to J.M.

68.     **DEGRAFT-JOHNSON** traveled to Shanghai, China, on October 16, 2019. He returned to the United States on October 21, 2019. The patient T.T. is an 80 year old female and Medicare beneficiary. On October 17, 2019, T.T. had an established patient visit with a medical assistant at HVINF while **DEGRAFT-JOHNSON** was abroad. On October 23, 2019, **DEGRAFT-JOHNSON** added a SUR appointment to the October 17, 2019, EMR calendar for T.T. and electronically signed an operative report falsely stating that he had performed an atherectomy on T.T. on October 17, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill BCBS $21,478.00 for this procedure under CPT Code 37229. Medicare paid HVINF $9,358.87 for that claim. Medicare paid **DEGRAFT-JOHNSON** a total of $28,052.29 for three other atherectomy claims related to T.T.

69.     **DEGRAFT-JOHNSON** traveled to the United Kingdom on December 12, 2019. He returned to the United States (New York) on December 18, 2019.

54

**DEGRAFT-JOHNSON** then traveled to Tallahassee, Florida, on December 19, 2019. The patient R.H. is an 80 year old male and an Aetna beneficiary. On December 17, 2019, R.H. had an established patient visit with a medical assistant at HVINF while **DEGRAFT-JOHNSON** was abroad. On January 10, 2020, **DEGRAFT-JOHNSON** added a SUR appointment to the December 17, 2019, EMR calendar for R.H. and electronically signed an operative report falsely stating that he had performed an atherectomy on R.H. on December 17, 2019. **AUSTIN** then modified the SUR appointment to show a Visit Status of "Checked Out." **DEGRAFT-JOHNSON** caused Company A to bill Aetna $21,752.00 for this procedure under CPT Code 37229. Aetna paid HVINF $11,679.89 for that claim. Aetna paid **DEGRAFT-JOHNSON** a total of $36,699.91 for three other atherectomy claims related to R.H. in late 2019 and early 2020. Previously, **DEGRAFT-JOHNSON** submitted four additional atherectomy claims related to R.H to Medicare for dates of service March 29, 2016, May 9, 2016, and March 8, 2017. The March 8, 2017, operative note describes an atherectomy of the right superficial femoral artery with a standard left groin puncture and "up and over" access to the right superficial femoral artery. Because R.H. had an endovascular aneurysm repair on May 24, 2016, with a Medtronic Endurant device, which advances the aortic bifurcation, the procedure as described in **DEGRAFT-JOHNSON**'s March 8, 2017, operative report is technically impossible to perform.

70.     Atherectomy comes in different forms, including rotational, orbital, directional, and laser. In his operative reports, **DEGRAFT-JOHNSON** described consistent use of either the Medtronic Turbohawk, the Boston Scientific Jet Stream rotational atherectomy system, or the Boston Scientific Rotoblator rotational atherectomy system. Purchase records also indicate that **DEGRAFT-JOHNSON** utilized the Medtronic Silverhawk, and Hawk One atherectomy systems. From approximately in or around September 2015 to in or around October 2016, **DEGRAFT-JOHNSON** primarily used the Medtronic Turbohawk system to perform atherectomies. From in or around October 2016 until February 13, 2020, **DEGRAFT-JOHNSON** primarily used the Boston Scientific Jet Stream and the Boston Scientific Rotoblator atherectomy systems.

71.     To properly utilize these systems to perform atherectomies, certain non-reusable components are necessary. The necessary, non-reusable equipment costs, with some variation, roughly two thousand dollars per procedure. **DEGRAFT-JOHNSON** did not purchase sufficient equipment to perform as many atherectomies as he claimed to have performed because medical device representatives, who were usually present during the procedures, might have noticed the phantom claims (Steps 2 and 4) and in order to maximize the profit of the conspiracy and scheme to defraud health care benefit programs.

4:20cr4-MW/MAF-1

72.     Analysis of purchase records establishes that **DEGRAFT-JOHNSON** obtained atherectomy devices sufficient to perform approximately **528** atherectomies. A CPT code report generated from the EMR establishes that **DEGRAFT-JOHNSON** caused the submission of claims to health care benefit programs for **3,542** distinct atherectomy procedures relating to **845** HVINF patients. **DEGRAFT-JOHNSON** could not have performed approximately **3,014**, or **85%**, of the atherectomy procedures he claimed to have performed.

73.     The CPT code report and health care benefit program records establish that these 3,542 atherectomy claims were submitted to 38 health care benefit programs in 5,141 submissions (some claims were submitted to both a primary, secondary, or tertiary payer). Some of those health care benefit programs paid **DEGRAFT-JOHNSON** approximately **$33,837,919.48** for these atherectomy claims according to the following table.

| Healthcare benefit programs | Total paid for all services billed by Dr. deGraft-Johnson | Total paid for atherectomy claims (37225, 37227, 37229, and 37233) | Percentage of total paid for atherectomy claims |
|---|---|---|---|
| Medicare | $12,787,447.86 | $11,688,266.60 | 91% |
| CHP | $7,665,878.20 | $7,363,891.67 | 96% |
| BCBS | $5,242,822.61 | $4,706,512.34 | 89% |
| WellCare | $4,805,226.55 | $4,394,054.97 | 91% |
| UHC | $3,673,461.62 | $3,342,931.25 | 91% |
| Humana | $1,389,699.55 | $1,291,394.96 | 93% |
| Florida True Health | $481,813.52 | $411,974.62 | 85% |
| Tricare | $479,315.70 | $348,620.00 | 72% |

4:20cr4-MW/MAF-1

| | | | |
|---|---|---|---|
| Aetna | $256,257.72 | $246,222.59 | 96% |
| Cigna | $52,859.67 | $44,050.48 | 83% |
| **Totals** | **$36,834,783.00** | **$33,837,919.48** | **88%** |

This table does not include reimbursement payments from several health care benefit programs for approximately 203 atherectomy primary claim submissions.

74.     **DEGRAFT-JOHNSON** generally utilized Synovus Bank account ending in *4135 ("Synovus *4135") as the primary "deposit" account for all healthcare-related funds flowing to HVINF from health care benefit programs. Synovus *4135 is held in the name of Thorvasc PA DBA HVINF. **DEGRAFT-JOHNSON** was the sole signer on the account. Between November 1, 2015, and February 13, 2020, health care benefit programs paid HVINF approximately **$37,713,833.71**. **DEGRAFT-JOHNSON** used these funds to acquire property described in CM/ECF document 95-1, an asset list attached to the Government's Notice of Bill of Particulars, ECF No. 95, which are hereby incorporated by reference into this Statement of Facts.

## ELEMENTS

### COUNT ONE (18 U.S.C. §1349) –
### Conspiracy to Commit Health Care Fraud

(1) that two or more people in some way agreed to accomplish a shared unlawful plan to commit health care fraud, as charged in the indictment; and

(2) the Defendant knew the unlawful purpose of the plan and willfully joined it.

4:20cr4-MW/MAF-1

## COUNTS TWO THROUGH FIFTY-SEVEN (18 U.S.C. §1347) –
## Health Care Fraud

(1) the Defendant knowingly executed, or attempted to execute, a scheme or artifice to defraud a health-care benefit program, or to obtain money or property owned by, or under the custody or control of, a health-care benefit program by using false or fraudulent pretenses, representations, or promises;

(2) the health care benefit program affected interstate commerce;

(3) the false or fraudulent pretenses, representations, or promises related to a material fact;

(4) the Defendant acted willfully and intended to defraud; and

(5) the Defendant did so in connection with the delivery of or payment for health-care benefits, items, or services.

## COUNT FIFTY-EIGHT (18 U.S.C. §1028A) –
## Aggravated Identity Theft

(1) the Defendant knowingly transferred, possessed, or used another person's means of identification;

(2) without lawful authority; and

(3) during and in relation to the scheme to defraud Medicare alleged in Counts Thirteen, Sixteen, Seventeen, and Nineteen of the Indictment.

4:20cr4-MW/MAF-1

Respectfully submitted,

LAWRENCE KEEFE
United States Attorney

_____
MARK O'MARA
Attorney for Defendant

_____
ANDREW J. GROGAN
Assistant United States Attorney
Northern District of Florida
Florida Bar No. 85932
111 North Adams Street, Fourth Floor
Tallahassee, Florida 32301
(850) 942-8430
andrew.grogan@usdoj.gov

Date: 12/8/20

Date: 12/18/2020

_____
MOSES D. DEGRAFT-JOHNSON
Defendant

Date: 12/16/2020

60